UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ------------------------------------------------------------ X
ANTHONY ZAPPIN,

                                Plaintiff,

                   - against -

DAVID EVAN SCHORR,
MATTHEW F. COOPER,
KEVIN M. DOYLE,

                           Defendants.

 ------------------------------------------------------------ X

Case No. _____

**COMPLAINT**

Jury Trial Demanded

Plaintiff Anthony Zappin ("Plaintiff") hereby brings this action against Defendants David

Evan Schorr ("Schorr"), Matthew F. Cooper ("Cooper") and Kevin M. Doyle ("Doyle") alleging

the following:

### THE PARTIES

1.      Plaintiff Anthony Zappin is a resident of the State of South Carolina.

2.      Upon information and belief, David Evan Schorr is a resident of the State of New

York.

3.      Upon information and belief, Matthew F. Cooper is a resident of the State of New

York.

4.      Upon information and belief, Kevin M. Doyle is a resident of the State of New

York.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §

1331 as it arises from the Constitution and the laws of the United States, namely 42 U.S.C. § 1983

and 18 U.S.C. § 1964.

6.      Additionally, this Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff has a different citizenship (South Carolina) from each of Defendants (all New York) in this action.   Additionally, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Additionally, the District Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims within the Court's original Section 1331 jurisdiction that they form part of the same case and controversy amongst the parties.

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims in this action occurred in this Judicial District.

## FACTUAL ALLEGATIONS

I.    David Evan Schorr

9.      Defendant David Evan Schorr is a professional conman, grifter and thief.  As shown below, Schorr has engaged in over two dozen disbarrable offenses starting in 2012 and continuing to present day.   However, in order to avoid losing his law license, he injected himself into Plaintiff's personal divorce and child custody proceeding, *Zappin v. Comfort*.  There he devised ways to turn the Attorney Grievance Committee on Plaintiff, cut deals with the highly influential court-appointed "Attorney for the Child" Harriet Newman Cohen to tank Plaintiff's case so that Ms. Cohen would assist him in his own disciplinary matters and later cut deals with the Attorney Grievance Committee to destroy and manipulate evidence and deliberately subvert Plaintiff's positions in *Zappin v. Comfort* so that the Attorney Grievance Committee could more easily prosecute Plaintiff in exchange for allowing Schorr to keep his law license.

a.      David Evan Schorr's History of Misconduct

10.     Schorr has a long history of engaging in attorney misconduct beginning in 2012.

11.     In his own personal divorce proceeding where he was representing himself pro se, Schorr was found to have engaged in several disbarrable acts of attorney misconduct.  These acts included, but are not limited to:

a.      Schorr was found to have affirmatively lied under oath during his testimony.

b.      Schorr "persistent[ly] fail[ed] to answer direction questions [that] results in the Court granting countless motions to strike [his] answers, together with admonitions to answer the questions as posed."

c.      Schorr was repeatedly "argumentative and disrespectful" to the court (Judge Ellen Gesmer) to the point where he was continuously admonished during the proceedings.

d.      Schorr failed to pay *pendente lite* child support as ordered by the court.  In his defense, he claimed – as an attorney – not to understand the meaning of the *pendente lite* child support provisions.

e.      Schorr made "contradictory statements in various financial documents," which established that he had lied to the Internal Revenue Service about his income to the tune of hundreds of thousands of dollars.

f.      Schorr "continued to deny throughout the trial that the money judgments entered against him were the result of his failure to pay [his ex-wife] monies due to her under the *Pendente Lite* Order," (*i.e.*, Schorr is a deadbeat dad (like Defendant Wallack) who refuses to pay child support).  As a result,

Justice Gesmer issued an award and sanction of $52,000 for child support arrears against Schorr.

g.   Based on the evidence presented at the financial trial, Schorr has misappropriated (*i.e.*, stolen) funds from his late father's estate and used the funds for personal purposes.

h.   Schorr deliberately lied and misrepresented his income to the court to the tune of hundreds of thousands of dollars.

i.   Schorr used his *pro se* status in the divorce to gratuitously run up fees on his ex-wife, Bari Yunis Schorr, resulting in Justice Gesmer sanctioning Schorr $50,000 and directing that it be paid to her counsel, Louis I. Newman, in satisfaction for attorneys' fees incurred due to Schorr's frivolous conduct in the litigation.  Specifically, Gesmer noted that Schorr "engaged in contentious and meritless motion practice and other obstructionist conduct, causing the Wife to incur unnecessary legal fees."

j.   Schorr manifested a "pattern of nonpayment" with respect to child support requiring Justice Gesmer to issue an order directing that Schorr "post the sum of $75,000 as security to insure future payment of child support."  To date, Schorr has not complied with this directive.

Justice Gesmer's full decision lambasting Schorr is attached to this Complaint as Exhibit 1.  It should be further noted that Schorr was later held in contempt by Justice Michael Katz for his failure to obey Justice Gesmer's orders.

12.   Schorr's schemes and scams unfortunately do not end there.  In fact, **Schorr attempted to grift a bankruptcy scam in this very court**.  More specifically, Schorr filed two

(2) apparent sham bankruptcy proceedings in this court.  These sham bankruptcies were filed in order to try to circumvent an order by Justice Gesmer in the above-referenced financial decision that the Schorr martial residence be sold and the proceeds distributed as well as a subsequent contempt order (with the direction that Schorr be jailed) issued by Judge Katz for Schorr's willful failure to obey Justice Gesmer's financial orders.  In the proceedings, the SDNY bankruptcy trustee accused Mr. Schorr of filing "bad faith" and "frivolous" bankruptcy petitions.  (*See* Ex. 2, Trustee Motion to Dismiss at pp. 1-2.)  In support of this position, the trustee pointed to the following facts, which Schorr did not dispute:

a.  Schorr "filed Amended Schedules that he knew to be patently false, apparently to invoke the automatic stay."  The trustee further pointed out that Schorr's "cavalier attitude about documents filed under oath should not be tolerated."

b.  Schorr deliberately misrepresented and underreported the value of the martial residence in the Amended Schedules he filed with the bankruptcy court and attested to under oath.

c.  Schorr lied about the balances in his checking account in the Amended Schedules filed with the bankruptcy court and attested to under oath.

d.  Schorr intentional failed to incorporate the findings of the First Department in his Amended Schedules, such as the finding that Joel Yunis (Schorr's former father-in-law) has a claim of $124,000 against him.  Instead, Schorr lied on the Amended Schedules stating that Yunis' claim was $62,000, that it was "disputed" and described the claim as "Expired Demand Notes" contrary to Justice Gesmer's and the First Department's orders.

e.   Schorr was found to have concealed assets from the trustee and the bankruptcy court and trustee.

f.   Schorr filed the sham bankruptcies in bad faith to "thwart the consequences of a state court action," where at the time Schorr was facing imminent incarceration for his failure to obey Justice Gesmer's financial order and Justice Katz's contempt orders.

g.   Schorr "fail[ed] to meet deadlines… fail[ed] to file a confirmable plan… manipulat[ed] [] his income… and… fil[ed] schedules with inaccurate Amended Schedules" throughout the two sham bankruptcies.

(*See generally id.*)  In sum, the trustee – an individual totally unconnected with the matrimonial law mafia – asserted that Schorr engaged in the same *mondus oeprandi* that he did in his prior divorce action before the New York County Supreme Court, namely that he lied under oath repeatedly, that he filed sham proceedings to thwart state court orders and he engaged in a pattern of frivolous and bad faith behavior throughout the bankruptcy litigations.   Indeed, Louis I. Newman noted in his papers in the bankruptcy proceedings that Schorr was the "post boy for bad faith filings."  *See In re Schorr*, Case No. 1:17-bk-13143 (S.D.N.Y. 2018) at Dkt. No. 18.  The bankruptcy judge agreed and granted the trustee's motion to dismiss the two sham proceedings.

13.   More recently, Schorr attempted to conceal assets by circumventing the Cuban Embargo (an illegal act) to purchase a "hostel" in Cuba.  (*See* Ex. 3, *La Palma LLC* Operating Agreement.)  According to Schorr's business partner and documents from subsequent litigation, Schorr's intent in purchasing the hostel in Cuba was partially to hide assets from his wife that would otherwise be subject to levy as a result of the many money judgments filed against Schorr. However, his primary purpose according to litigant documents and his business partner's

statements was to establish a "sex hotel and resort" in Cuba.  Apparently, Schorr intended to house young and underage girls in the hostel for sex trafficking purposes while "wealthy and powerful Americans" visited the property in Cuba under the guise of "humanitarian" trips.  In other words, Schorr intended to make an even darker and twisted Jeffrey Epstein island exploiting young and underage girls in Cuba.  In order to facilitate purchase of the property, Schorr engaged in the following acts of attorney misconduct:

<blockquote>

a.      Schorr unlawfully used his elderly mother Marcia Schorr as the strawman to purchase the illegal sex trafficking hostel in Cuba.

b.      Schorr executed an illegal and unlawful sham power of attorney instrument on behalf of his mother to purchase the sex trafficking hostel in Cuba in which he unethically notarized it despite being an interested party.

c.      Schorr filed bogus arbitration litigation against his business partners after they reneged on the deal after learning of Schorr's insidious plans for the hostel.

d.      Most recently, Schorr filed a federal suit in this Court against the ICDR/AAA for throwing out his arbitration claims against his business partners because of his misbehavior during the proceeding and after the ICDR/AAA referee learned that Schorr intended to use the hostel to sex traffic young Cuban girls.

</blockquote>

As shown above, Schorr has a long and well-document history of abusive litigation tactics, unethical conduct, fraud and underhanded schemes designed to subvert judicial proceedings.  Unfortunately, Plaintiff was also a victim of Schorr in the *Zappin v. Comfort* child custody proceeding and subsequent collateral estoppel disciplinary proceeding brought against Plaintiff.

B.       Schorr's Scheme to Turn the AGC on Plaintiff and Manipulate the *Zappin v. Comfort* Child Custody Proceedings on behalf of the AGC and Justice Matthew Cooper

       i.       Plaintiff's Initial Involvement with Schorr

14.     Sometime in 2014, Plaintiff read a series of articles in *The New York Post* and other media outlets about the *Schorr v. Schorr* matrimonial proceeding. Specifically, in those articles, Schorr was found to be an "unfit father" by the court-appointed child custody evaluator and Justice Deborah Kaplan for Schorr's abusive behavior towards his son with respect to a trip to McDonalds. In retaliation, the articles noted that Schorr sued the court-appointed child custody evaluator in New York County Supreme Court.

15.     In one article, it mentioned that Justice Kaplan had recused herself from the *Schorr v. Schorr* matrimonial action, but did not explain why she recused herself. Plaintiff found Schorr's contact information and reached out to him to see what exactly had happened in the case. At that time, Justice Kaplan had repeatedly directed that Plaintiff have supervised visitation with his child without afforded Plaintiff as hearing as required by New York law. Plaintiff wanted to know if Justice Kaplan has engaged in some impropriety or other act that would impact other cases in her courtroom.

16.     Shortly after Plaintiff reached out to Schorr, he responded with a phone call. On that call, Schorr recounted the story of his matrimonial action. He then – very proudly – explained how he got Justice Kaplan recused from the *Schorr v. Schorr* matter. Specifically, Schorr claimed that Justice Kaplan's Court Officer, Jeffrey Katz, attempted to assault him in the courtroom and that he had recorded the incident on his phone. He further stated that Justice Kaplan recused herself from the case after Schorr subpoenaed Justice Kaplan and her staff.

17.     Schorr went on during this initial phone call to describe his hate for Justice Kaplan repeatedly calling her a "cunt," a "kike," a "JAP," a "bitch" and a "dumb bitch."  He also extensively described Justice Kaplan's connections to the Lucchese Crime Family.  And, most importantly, he described his deep desire to see her removed from the bench.

18.     After that initial call, Plaintiff received a flood on articles and books about Justice Kaplan from Schorr.  Some of the articles described bizarre ruling she had made with respect to supervised visitation.   Others were books and articles that detailed Justice Kaplan's and her father's, Burton Kaplan, involvement in the mafia.  Looking back, it was apparent that Schorr was obsessed with Kaplan, had a strong disdain for her, had extensively researched her live and was singularly focused on seeing her removed from the bench.

ii.     Schorr Pressures and Weasels His Way into *Zappin v. Comfort*

19.     The first few instances of contact between Plaintiff and Schorr primarily focused on Justice Kaplan as a topic of discussion.  However, over the course of several months, Schorr would more frequently contact Plaintiff to discuss his matrimonial proceeding, his ongoing disciplinary investigation and his desire to become a matrimonial lawyer.  To be fair, Plaintiff would also discuss his child custody proceeding with Schorr as Plaintiff had limited people in his life who could relate to being in a high-contested divorce proceeding.

20.     In the April 2015, Plaintiff retained Lara Ott to represented him in the *Zappin v. Comfort* matrimonial action.  Ms. Ott charged Plaintiff a $50,000 retainer and had an hourly rate of approximately $700 an hour.  Plaintiff could not afford her fees, but was left with little options as he was repeatedly and viciously attacked for representing himself by the Wallack and Cohen Defendants as well as Justice Kaplan.

21.     Over the course of the next couple of months, Schorr relentlessly nagged Plaintiff that he should fire Ott and allow Schorr to represented him in *Zappin v. Comfort*.  Plaintiff was extremely hesitant about this idea.  Plaintiff knew that Schorr had no experience as a litigator, that Schorr could be devious and that Schorr has a poor reputation in the court system.  Most importantly, Plaintiff knew that Schorr was under investigation by the AGC for his misconduct in his own divorce.

22.     Nevertheless, Schorr had already began to enact his plan to take revenge on Justice Kaplan and deflect from his own attorney misconduct by turning the AGC spotlight on Plaintiff. He did so by pressuring Plaintiff to file a Court of Claims suit against Justice Kaplan to get her removed from the bench – something which Plaintiff did not want to do.  More specifically, in April 2014 after a proceeding in *Zappin v. Comfort*, Plaintiff was grabbed and slammed against the wall by Justice Kaplan's court officer, Jeffrey Katz, after Justice Kaplan purportedly told him to escort Plaintiff to the adjacent hallway.  Plaintiff sustained bruising to his arm and hip.  Once Schorr learned of the altercation, he immediately pressed Plaintiff to sue Officer Katz and Justice Kaplan in the Court of Claims.  Indeed, Schorr went so far as to draft the Court of Claims complaint for Plaintiff.  (*See* Ex. 4, Schorr E-mail Containing Court of Claim Complaint.)  After Plaintiff decided not to file it, Schorr put even more pressure on Plaintiff screaming at him:  "How can you let her (Kaplan) sit on the bench after she put you in the hospital?  You have an obligation to file it.  Don't be a pussy, file it."  Being susceptible to influence, Plaintiff filed the suit, which immediately turn the ire of the New York court system again him and placed him in the cross-hairs of the AGC.

23.     By mid-summer in 2015, Ms. Ott burned through Plaintiff's $50,000 retainer in a matter of days.  Plaintiff did not have hundreds of thousands of dollars to pay Ms. Ott for

representation during pre-trial proceedings and the child custody trial.  Put simply, he could not afford Ms. Ott's representation.

24.     Additionally, at this time, Plaintiff was battling severe depression induced as a result as a result of the *Zappin v. Comfort* proceeding, namely the abusive treatment he received from Harriet Newman Cohen and Justice Deborah Kaplan.  Plaintiff was seeking psychiatric counseling, but the depression was compounded by the fact that Plaintiff had developed a serious Valium addiction through prescriptions he received from his psychiatrist as a way of coping with the depression and panic attacks triggered by the Matrimonial Action.  Indeed, there were many days during this period of time that Plaintiff had taken so much Valium as a coping mechanism that he did not know where he was, did not later recall things he had done while on the Valium and often woke up with strange women in his apartment.

25.     Schorr took advantage of Plaintiff during one of Plaintiff's depression episodes. Specifically, Schorr persuaded Plaintiff to fire Ms. Ott where he played on Plaintiff's fears of Ms. Ott running up a half-million-dollar bill.  He further got Plaintiff to agree to allow Schorr to represent him in *Zappin v. Comfort*.  Schorr asked for $10,000 to do the representation, which Plaintiff paid.  Schorr demanded that the money be paid to him in cash so that there was no "paper trial" for his ex-wife to find and because he wanted to represent to the court that he was "pro bono counsel," which he believed would help him in his disciplinary proceeding.

26.     However, several days later when the Valium cleared his system, Plaintiff realized that Schorr could not represent him in *Zappin v. Comfort*.  Ms. Ott declined to retake the case. Plaintiff consequently told Schorr that he could be "co-counsel."  Schorr's duties would largely be sitting at counsel's table and keeping his mouth shut.  It certainly did not turn out that way.

27.     It must be noted that throughout Schorr's entire representation of Plaintiff as "co-counsel," he repeated stated things like:  (i) "I'm doing what is best for you"; (ii) "I'm offering this advice because its in your best interests";  (iii) "I'm acting in your interests."; and (iv) "If you let me represent you (or continue to represent you), I will work for your best interests and give you counsel that I think is in your best interests."  As set forth below, these statements and the numerous ones like that were false and fraudulent.

      iii.     <u>Schorr's Disastrous Advice and Representation of Plaintiff in *Zappin v. Comfort* Designed to Undermine Plaintiff's Case and Create a Disciplinary Case against Plaintiff in a Collusive Scheme with Harriet Newman Cohen, Defendant Cooper and Defendant Doyle</u>

28.     While Schorr purported to represent and advise Plaintiff in *Zappin v. Comfort*, his true intent was to purposely subvert and sabotage Plaintiff's position in the litigation in order to create a disciplinary case against.

29.     When it became apparent to Schorr that Robert Wallack (Plaintiff's ex-wife's counsel) and Harriet Newman Cohen could help him launch his matrimonial law practice as well as assist him in his disciplinary defense, Schorr undertook a scheme with both the Wallack and Cohen Defendants to undermine Plaintiff's position in the case and to pervert the *Zappin v. Comfort* child custody proceedings into a way to manufacture bogus allegations of attorney misconduct against Plaintiff.  When Schorr found out that Mr. Wallack and Ms. Cohen were actively working with Defendant Doyle at the AGC to manufacture a disciplinary case against Plaintiff, Schorr joined in the scheme.

30.     There are numerous examples from the *Zappin v. Comfort* case in which Schorr advised, pressured and directed Plaintiff to carry out or perform some action in the litigation that only served to undermine Plaintiff's position.  At the time, Plaintiff undertook some of these actions and disregarded others.  Looking back and by Schorr's own later admission, however,

Schorr's advice to Plaintiff was to serve four (4) purposes:  (i) set traps for Plaintiff that the Mr. Wallack and Ms. Cohen could exploit in *Zappin v. Comfort* so as to allow Schorr to ingratiate himself with them; (ii) make it appear that Plaintiff engaged in similar, but more exaggerated conduct than Schorr had previously engaged in his own divorce matter so that Schorr could claim to the Attorney Grievance Committee that his actions were "mild" compared to Plaintiff's;  (iii) to get Plaintiff to engage in conduct where Schorr could later come in and appear to be the cool and level-headed attorney that Schorr could later as mitigation evidence in his disciplinary proceeding; and (iv) take direction from Mr. Wallack, Ms. Cohen and Defendant Doyle as to actions to take in *Zappin v. Comfort* or courses of actions to advise Plaintiff to take in order to manipulate the child custody proceeding such that the AGC could bring a disciplinary case against Plaintiff.  Put simply, Schorr exploited Plaintiff and sold him out in order to cut deals with Wallack, Cohen and, most importantly, Defendant Doyle and the AGC.

1. Some of the most egregious examples of Schorr advising, pressuring and directing Plaintiff to undertake actions detrimental to his case include, but are not limited to, the following examples:

- Schorr advised and pressured Plaintiff to file a complaint with the New York Office of Professional Medical Conduct against Dr. Aaron Metrikin, Cohen's retained expert in *Zappin v. Comfort*, after Schorr learned his fee and the fact that Dr. Metrikin had no experience in child custody litigations or child behavioral health. It must be noted that, as explained *supra*, Schorr attacked and sued two (2) court-appointed experts in his own divorce.  Plaintiff was sanctioned by Justice Matthew Cooper for the OPMC complaint.  Looking back and based on Schorr's recent

statements, it was clear that Schorr was working in tandem with Cohen in an effort to gin up a reason for the matrimonial court to sanction Plaintiff.

- In the litigation, Cohen intended to call as a witness a girl that Plaintiff had a brief sexual relationship with while he was clerking, Kathryn Kelly, an attorney at Gibson Dunn LLP.  Plaintiff ended the relationship after finding out Ms. Kelly was sleeping with other people and after he discovered photographs of her having sex in the chambers of a United States Circuit Judge.  In an apparent attempt by Schorr, Wallack and Cohen to set Plaintiff up for some type of witness intimidation or revenge porn charge, Schorr exerted immense pressure on Plaintiff to post the photographs of Ms. Kelly on the Internet.  Schorr's reasoning was that after Justice Cooper's public sanction, Plaintiff had to let the public know that the allegations were true.  Plaintiff refused to publicly post the photographs and instead contacted her counsel to determine how best to proceed with the picture if Ms. Kelly were to testify at the child custody trial.

- Schorr directed, pressure and assisted Plaintiff's father to setup a website called: "http://www.justicedeborahkaplan.com".  Schorr initially approached Plaintiff with the idea about the website, but Plaintiff refused to participate.  The eventual website contained information about Justice Kaplan's ties to the Lucchese Crime Family, allegations that she had abused her position on the bench, lied under oath and had orchestrated assaults on litigants.  The website also called for her removal from the bench;

- Schorr directed, pressure and assisted Plaintiff's father to setup a website called: "http://www.harrietnewmancohen.com".  Again, Schorr approached Plaintiff with

the idea for the website, but Plaintiff refused to participate. The website contained numerous documents from the *Zappin v. Comfort* case and called for the removal of Harriet Newman Cohen as Attorney for the Child.  Plaintiff, despite having nothing to do with the website, was accused of setting up the website in Justice Cooper's sanction decision and was apparently disciplined by the First Department for it too (despite never being charged with any disciplinary offense).  Once again, it appears that Schorr's advice was an attempt to set a trap for Plaintiff that Wallack and Cohen could exploit;

- After Justice Cooper's sanction decision, Schorr pressured and directed Plaintiff to setup a website "http://www.justicematthewcooper.com" in order to "counter Justice Cooper's falsehoods in the sanction decision…."  Schorr helped Plaintiff design and select content for the website.  Furthermore, Schorr provided Plaintiff with a CLE in which Cooper was a presenter.  Schorr helped Plaintiff make clips Cooper making inappropriate comments at the CLE, which were then posted on YouTube and the website.  Again, it appears that Schorr's advice was an attempt to set a trap for Plaintiff that Wallack and Cohen could exploit; and

- Additionally, after Justice Cooper's sanction decision, Schorr pressured, directed and assisted Plaintiff in setting up "http://www.zappinvcomfort.com."  The website contained filings and other materials from the *Zappin v. Comfort* case that became a hot-button issue during the child custody trial.  Yet again, it appears that Schorr's advice was an attempt to set a trap for Plaintiff that Wallack and Cohen could exploit.

2.      Schorr's attempts to subvert Plaintiff's case became more evident as the child custody trial progressed, however.  Some of these actions by Schorr included:

- Schorr tainted two (2) of Plaintiff's forensic pathologist expert witnesses. Specifically, Plaintiff asked Schorr to contact them to gauge their interest in being an expert witness to testify about the inconsistencies in Comfort's alleged domestic violence injuries.  However, Plaintiff later learned that Schorr falsely told the two (2) expert that Plaintiff had actually inflicted the injuries on Ms. Comfort – something which Plaintiff has <u>always</u> denied – and that Plaintiff was looking for an expert to who testify that he did not inflict the injuries.  Both witnesses obviously refused to testify.  Plaintiff believes that Schorr deliberately sabotaged Plaintiff's two (2) experts in the middle of trial as part of the scheme with Wallack and Cohen to subvert Plaintiff's case.

- Schorr directed Plaintiff's father to leave the courthouse in order to prevent him from testifying despite the fact that Plaintiff's father was a material witness – a witness who could testify as to Ms. Comfort's domestic abuse towards Plaintiff – and Plaintiff needed him to testify.  Schorr apparently did not want Plaintiff's father to testify because Plaintiff's father was an eye-witness to domestic violence, but also Plaintiff's father would be subject to examination about the websites that Schorr helped him create about Justice Deborah Kaplan and Harriet Newman Cohen;

- Schorr directed Plaintiff not to produce his cells phones in response to a directive by Justice Cooper.  At the time, Schorr begged Plaintiff not to produce his cell phones because Schorr believed that had compromising statements made by him in

text messages and e-mails about his conduct, Justice Deborah Kaplan and other members of the judiciary that would have no doubt resulted in disciplinary action against him.  However, Schorr was also motivated to discourage Plaintiff from producing the phones in a concerted effort with the Wallack and Cohen Defendants to attempt to manufacture an adverse inference that Plaintiff falsified text messages at-issue in the proceeding; and

- At times, Schorr encouraged and egged on Plaintiff to be confrontational with Justice Cooper during the child custody hearing.

- Schorr deliberately refused to raise or preserve objections on Plaintiff's behalf when necessary or called to do so in order to preserve a record on appeal.

Once again, these are just a few notable examples.  Schorr, throughout his participation in *Zappin v. Comfort*, worked to undermine Plaintiff's case as part of a crooked scheme with the Wallack and Cohen Defendants designed to undermine Plaintiff's case and to pervert the proceeding to manufacture bogus allegations of attorney misconduct

31.    Plaintiff eventually fired Schorr near the end of the *Zappin v. Comfort* child custody trial after it became apparent that he was working in tandem with the Wallack, Cohen and Doyle. However, the straw that finally broke the camel's back is when Plaintiff and his then-girlfriend took Schorr to lunch during the trial.  Both Plaintiff and his then-girlfriend observed Schorr inappropriately touch the hair, face, legs and crouch area of a young girl at a nearby table.  After observing this and speaking with his former girlfriend about the incident, Plaintiff fired Schorr as his co-counsel.  It became apparent to Plaintiff that David Evan Schorr was a pedophile and Plaintiff did not want to be associated in any way with him.

32.     When Plaintiff fired Schorr after the close of evidence in the *Zappin v. Comfort* trial (but before closing statements), Schorr made a very ominous statement to Plaintiff on the phone call.  Specifically, he told Plaintiff:  "It doesn't matter.  The whole trial was a sham. Cooper's going to make up abunch of findings like he did in the sanction decision and Doyle is going to prosecute you.  The whole thing was a setup."  At the time, Plaintiff thought that Schorr was making conjecture.  However, Plaintiff recently learned that at the time Schorr made these statements, Schorr had actual knowledge that this was the plan Wallack, Cohen, Defendant Cooper and Defendant Doyle intended to undertake.

iv.     The Collusive Scheme Between Schorr and the Wallack and Cohen Defendants Continued After *Zappin v. Comfort*

33.     This collusive scheme between Schorr, Wallack, Cohen and Doyle continued even after the *Zappin v. Comfort* child custody trial was over.  More specifically, based on their perversion of the *Zappin v. Comfort* child custody trial, Justice Cooper issued several punitive findings against Plaintiff, all of which lacked any evidentiary basis.  In furtherance of this scheme, Defendant Doyle– the same disciplinary counsel investigating Schorr – filed an unconstitutional collateral estoppel disciplinary petition against Plaintiff.  Subsequently, Plaintiff was found guilty of attorney misconduct and disbarred without notice, without a hearing, without any opportunity to defend himself and based on Justice Cooper's findings that even the Attorney Grievance Committee has conceded were fabricated and lacked any evidentiary support.

34.     With respect to Schorr, he continued to work the Wallack, Cohen and Doyle to ensure Plaintiff be disbarred.  Indeed, Cohen, Wallack and Doyle were all obsessed with seeing Plaintiff disbarred, even if it was without any legitimate basis.  Specifically, Schorr did the following in furtherance of this scheme in injure Plaintiff and ingratiate himself with the Wallack, Cohen and Defendant Doyle:  (i) Schorr destroyed exculpatory evidence from the *Zappin v.*

*Comfort* child custody proceedings that was solely in his possession and was material to the collateral estoppel disciplinary proceeding later brought against Plaintiff by Staff Attorney Doyle, *i.e.*, the metadata to Defendant Comfort's purported domestic violence photographs showing that they were digitally altered (both the picture itself and the timestamps of when the photographs were taken); and (ii) refused to truthfully participate as a witness in the collateral estoppel disciplinary proceedings against Plaintiff and threatened to lie if subpoenaed.   In effect, the Wallack, Cohen and Defendant Doyle exerted influence over Schorr and engaged in a *quid pro quo* with him that amounted to witness tampering and a conspiracy to destroy material evidence.

v.     Schorr's *Quid Pro Quo*

35.     In exchange for Schorr's actions related to Plaintiff, Schorr received assistance from Wallack and Cohen.   Specifically, the Wallack and Cohen gave Schorr the following assistance:

- Wallack and Cohen helped Schorr setup his matrimonial practice in New York. Both Wallack and Cohen referred him several clients after *Zappin v. Comfort*.

- Wallack and Cohen formally and informally "vouched" for Schorr with the AGC and submitted character statements to the AGC and First Department on his behalf during Schorr's own attorney disciplinary proceeding.   Both Wallack and Cohen lobbied Defendant Doyle to seek a substantially lesser sanction against Schorr, which he ultimately received.   These efforts are reflected in Schorr's 2018 disciplinary decision both explicitly and implicitly based on the fact that Defendant Doyle concealed and misrepresented countless other findings of attorney misconduct by Schorr to the First Department in the disciplinary proceeding.

- At the time, counsel to Schorr's ex-wife, Louis I. Newman, was aggressively seeking attorney discipline against Schorr for his misconduct in the *Schorr v. Schorr* matrimonial action. Cohen, in return for Schorr's deceitful conduct in *Zappin v. Comfort*, persuaded Mr. Newman to stop seeking attorney discipline against Schorr and stop filing complaints against Schorr to the bar.

- Wallack began to "hang out" with Schorr and bring him to clubs and parties after the conclusion of the *Zappin v. Comfort* matter. Wallack and Schorr frequented the "SoHo House" or "SoHo Club" together where they preyed on young woman and often engaged in group sex sessions. Notably, the "SoHo House" or "SoHo Club" is the same club that Harvey Weinstein used to lure and abuse women.[1]

These are some of the examples of benefits Schorr received from the conspiracy and scheme he engaged in with the Wallack and Cohen that sought to sabotage Plaintiff's position in the *Zappin v. Comfort* child custody proceedings. However, Plaintiff expects that additional benefits received by Schorr from this *quid pro quo* relationship will be revealed in the course of discovery in this action.

36.    In exchange for Schorr's actions related to Plaintiff, Schorr received favor from Defendant Doyle while he was prosecuting Schorr for attorney misconduct. As discussed above, Schorr was found to have engaged in numerous acts of attorney misconduct during his own matrimonial proceeding. Schorr told Plaintiff on multiple occasions that the AGC and Doyle were seeking disbarment or a "lengthy suspension" for his misconduct in that proceeding. However, as a result of Schorr's subversion in *Zappin v. Comfort*, Defendant Doyle only prosecuted Schorr on

---

[1]    *See* https://www.buzzfeednews.com/article/claudiarosenbaum/harvey-weinstein-emails; https://www.usnews.com/news/top-news/articles/2020-01-27/testimony-in-harvey-weinsteins-rape-trialenters-second-week; and https://www.cnn.com/2020/03/11/us/harvey-weinstein-sentencetranscript/index.html.

his unauthorized recording of a court proceeding in his matrimonial action and swept the rest of Justice Gesmer's misconduct findings under the rug.  Instead of being disbarred or suspended, Schorr received only a minor public censure and has continued to practice law.

37.     Moreover, Schorr has subsequently received effective immunity from the AGC after his role in *Zappin v. Comfort*.  Since being publicly censured, Schorr has:

- Attempted to setup a sex trafficking hostel in Cuba;

- Violated the Cuban Embargo by purchasing property in Cuba;

- Falsified documents in connection with the purchase of the land in Cuba;

- Unlawfully used his elderly mother as a strawman in the purchase and misused his notary stamp to effect a power of attorney document;

- Frivilously sued his former business partner and the AAA/ICDR;

- In his matrimonial practice, has engaged in unethical fee sharing arrangements with the Family Civil Liberties Union; and

- In his matrimonial practice, has charged excessive rates (*i.e.*, $100,000 retainers) in view on his experience as a matrimonial attorney and stolen client retainers and funds.

- To date, the AGC has refused to investigate, much less prosecute Schorr for any of these egregious ethical violations.  (*See* Ex. 5, E-mail from AGC.)

38.     Finally, in return for Schorr's actions in subverting Plaintiff's case in *Zappin v. Comfort*, Defendant Cooper helped Schorr avoid a more substantial disciplinary penalty.  Upon information and belief, Defendant Cooper had both oral and written communications with the First Department "vouching" for Schorr's good character and behavior in *Zappin v. Comfort*.  This is reflected both explicitly and implicitly in the 2018 Schorr disciplinary decision.

vi.   <u>Schorr Has Made Recent Statements Confirming the Scheme</u>

39.     Beginning in March of 2020, individuals have come to Plaintiff (sometimes with recordings) stating that Schorr made statements to them that he had:  (i) purposely sabotaged Plaintiff's child custody matter and subsequent disciplinary matter; (ii) that he worked with the Wallack, Cohen and Defendant Doyle to do it; and (iii) that Wallack, Cohen and Defendant Doyle helped him "keep his law license" and helped him "set up his matrimonial practice."

40.     With respect to one individual, Schorr made statements to them which include, but are not limited to, the following:

- Schorr referred to his involvement as Plaintiff's co-counsel in *Zappin v. Comfort* as "one of the greatest cons [he had] ever pulled off…. the guy paid me $20,000 to torpedo his case."

- Schorr stated that he had convinced Plaintiff that he was "going to die" with respect to the litigation and that he should "die running at the turret."

- Schorr referred to his involvement with Wallack and Cohen extensively. Specifically, he stated:  "You have to choose the side with power.  You have to choose the winning side.  Zappin was going to lose.  I simply parlayed my opportunity to get tight with Wallack and Harriet [Cohen].";

- Schorr continued:  "Wallack and Cohen were obsessed not just with winning… but making sure Zappin was disbarred.  They would come to me and ask for something and I would do it.  It's all about making friends in this business."

- Schorr further continued:  "Wallack and particularly Cohen throw me business. They helped me get started up.  Most importantly, Cohen got Newman and the bar [Attorney Grievance Committee] off my back"; and

22

- Schorr acknowledged that he cut a deal with the Attorney Grievance Committee and Staff Attorney Doyle for a reduced sanction in return for the destruction of the metadata to Defendant Comfort's photographs and his refusal to comply as a witness.  Specifically, Schorr said:  "It was easy!  I gave them Zappin and I kept my law license.  Simple as that.  I just had to keep my mouth shut, dodge any subpoenas and made sure the Comfort photograph[] [metadata] conveniently disappeared."

41.    Another individual heard Schorr make similar statements to those heard by Individual One.  The statements Individual B heard included, but are not limited to, the following:

- Schorr referred to Plaintiff as a "sucker."

- Schorr explained that the entire *Zappin v. Comfort* custody trial was a "trap" and a "setup.";

-  Schorr stated that:  "Everyone was against Zappin.  Cohen, Wallack, Cooper… they all wanted his head.  People that powerful, you don't stand in their way.  I saw an opportunity and I took it.  Zappin lost his law license, but I still have mine!";

- Schorr explained that Justice Cooper also was influential in getting a reduction in his disciplinary censure.  Schorr stated:  "I did so well even [Justice] Cooper made a call to Doyle and Dopico.";

- Schorr stated:  "Harriet and Kurland confided in me that they didn't believe Comfort's domestic violence allegations.  As Harriet put it:  they smelled like rancid fish wrapped in a week-old newspaper.  She was shocked that the

allegations have not faded away early on in the case they were so week.  But, it was Harriet who got the DV finding for Comfort.";

- Schorr further alluded that: "There came a point in the custody trial that I just took my orders from Harriet and to a lesser extent Wallack.  It was a well-orchestrated circus with a predetermined outcome:  FUCK ZAPPIN.";

- Schorr boasted that:  "It was really Harriet that persuaded Doyle to pursue a lesser sanction.  It was a brilliant move to align with her.";

- Schorr bragged: "You know, Zappin is a smart guy.  I think he knew something was up.  He kicked me to the curb during the trial.  But before that, I had him and his father so wound up making websites and videos.  It really played right into Harriet's and Wallack's strategy, which was to use the custody child decision to bring a disciplinary action against Zappin.";

- Schorr said:  "I don't feel bad about it.  In life, you have to pick the winning side."

42.     And another individual informed Plaintiff that Schorr told them that Doyle and Cooper had written both the September 2015 Sanction Decision and the February 29, 2016 Child Custody Decision in *Zappin v. Comfort* were written collaboratively between Defendant Cooper and Defendant Doyle with the purpose of bringing disciplinary action against Plaintiff based on those decisions.  Ask how he knew this, Schorr apparently responded:  "Doyle and I used to be staunch enemies.  But now, we're just old buddies."

43.     These statements clearly and evidently establish a conspiracy and scheme by Defendant Schorr and Defendant Doyle, along with Wallack and Coohe, to defraud Plaintiff, unlawfully damage his professional reputation and licensure, sabotage his position in the *Zappin*

24

*v. Comfort* custody trial and undermine the legitimacy of the *Zappin v. Comfort* matrimonial proceedings.

II.     Matthew F. Cooper (Retired Supreme Court Justice)

44.     Defendant Matthew Cooper was integral to the scheme to destroy Plaintiff's legal career and have him disbarred based on manufactured and falsified findings.  Indeed, Defendant Cooper presided over *Zappin v. Comfort* after Justice Deborah Kaplan was removed from the case. As detailed above, Defendant Cooper worked hand-in-hand with Defendant Doyle and indirectly with Defendant Schorr, as well as Harriet Newman Cohen and Robert Wallack, to manufacture and fabricate findings in *Zappin v. Comfort* that could be used to prosecute Plaintiff in an attorney discipline action.

45.     Defendant Cooper issued a September 18, 2015 decision sanctioning Plaintiff in *Zappin v. Comfort*.  (*See* Ex. 6, Sanction Decision.)  The sanction came before Plaintiff could even open his mouth in Defendant Cooper's courtroom having only been assigned the case in late July of 2015.   As discussed above, Defendant Cooper wrote this decision hand-in-hand and in consultation with Defendant Doyle.  The Sanction Decision contained remarkable and apparent fabrications intended to deceive the public, the First Department (on appeal and in a disciplinary investigation) and the members of the Attorney Grievance Committee (not staff attorneys).  The complete list of fabrications contained in the Sanction Decision intended to defraud are found in Exhibit 7.

46.     Defendant Cooper further carried out the scheme by admitting engaging in extrajudicial conduct by personally disseminating a copy of the statutorily sealed Sanction Decision to the *The New York Post*, *The New York Daily News* and *The New York Law Journal*.

47.     Notably, Defendant Cooper transmitted the Sanction Decision to the AGC and Defendant Doyle.  He did so knowing that it contained knowingly false findings as well as knowingly false representations and statements about Plaintiff's conduct

48.     Defendant Cooper issued a February 29, 2016 Child Custody Decision in *Zappin v. Comfort* that contained manufactured and fabricated findings.  As discussed above, Defendant Cooper wrote this decision hand-in-hand and in consultation with Defendant Doyle.  The Child Custody Decision contained remarkable and apparent fabrications intended to deceive the public, the First Department (on appeal and in a disciplinary investigation) and the members of the Attorney Grievance Committee (not staff attorneys).  In the Custody Decision, Defendant Cooper fabricated in part that:

- Plaintiff had given false testimony under oath.  However, the testimony attributed to Plaintiff by Defendant Cooper is found nowhere in the record.

- Plaintiff had introduced falsified text messages into the record at trial. However, the text messages described by Defendant Cooper, which he declared were falsified, are found nowhere in the record.

- Plaintiff had induced his expert witness, Dr. Manion, to give false testimony. This finding was based on Defendant Cooper's assertion in the Child Custody Decision that Dr. Manion testified that Plaintiff wrote his expert report.  In reality, Dr. Manion never gave such testimony.  Rather, he testified to the opposite:  that Dr. Manion himself wrote his expert report, not Plaintiff.

The complete list of fabrications contained in the Child Custody Decision intended to defraud are found in Exhibit 7

49.     Notably, Defendant Cooper transmitted the Child Custody Decision to the AGC and Defendant Doyle.  He did so knowing that it contained knowingly false findings as well as knowingly false representations and statements about Plaintiff's conduct.

50.     Defendant Doyle and the AGC subsequently used the Child Custody Decision to bring a collateral estoppel disciplinary matter (*i.e.*, a proceeding where Plaintiff was not entitled to a hearing on the merits to defend against the accusations of attorney misconduct) against Plaintiff.  Defendant Cooper knew that Defendant Doyle and the AGC would bring such a proceeding against Plaintiff when he transmitted the decision to them.

51.     In that action Plaintiff has requested discovery, namely communications between

III.    Kevin M. Doyle

52.     Kevin M. Doyle is a "Principal Staff Attorney" for the AGC.

53.     In 2015, he opened and later abandoned (after admitting Plaintiff engaged in no misconduct) an attorney disciplinary investigation against Plaintiff based on Defendant Cooper's 2015 Sanction Decision.

54.     In 2016, he filed a collateral estoppel disciplinary action against Plaintiff based on Defendant Cooper's Child Custody Decision.  He pursued the matter despite knowing and later admittedly that there was no evidence in the record to support Defendant Cooper's findings used to pursue discipline against Plaintiff.  Nonetheless, he continued to demand that Plaintiff be disciplined.  Plaintiff was disbarred in March 2018 as a result of Defendant Cooper and Defendant Doyle's fraudulent conduct.

55.     As discussed above, upon information and belief, Defendant Doyle actively participated and assisted Defendant Cooper in drafting the 2015Sanction Decision and the 2016 Child Custody Decision.  Both Defendant Cooper and Defendant Doyle crafted the decisions with

the intent of using them to bring (baseless and fraudulent) disciplinary charges and/or proceedings against Plaintiff.

56.    Defendant Doyle was also the prosecutor in Defendant Schorr's disciplinary matters from 2012-2018.  As discussed above, Defendant Doyle allowed Defendant Schorr to receive a lesser disciplinary sanction and failed to seek discipline on a number of misconduct findings rendered by Justice Ellen Gesmer against Defendant Schorr as a result of Defendant Schorr's material assistance in subverting Plaintiff's case in *Zappin v. Comfort* and other related acts.

IV.    <u>Defendants' Acts to Conceal Their Scheme</u>

57.    Defendants have engaged in continuous and repeated acts to conceal their scheme. Most notably, this has taken the form of refusing to produce documents that Plaintiff is otherwise entitled to obtain.  This includes documents and communications evidencing their scheme.

58.    Indeed, Defendants have concealed documents in the following ways despite Plaintiff being entitled to obtained them:

- In the disciplinary investigation based on the 2015 Sanction Decision, Defendant Doyle refused to produce discovery, including his communications with Defendant Cooper, as required by 22 NYCRR 1240 *et seq*.

- In the collateral estoppel disciplinary proceeding based on the 2016 Child Custody Decision, Defendant Doyle refused to produce discovery, including his communications with Defendant Cooper, Cohen, Wallack, Defendant Schoor and numerous others, as required by 22 NYCRR 1240 *et seq*.  Indeed, Defendant Doyle failed to produce a single document of discovery during the proceeding, despite Plaintiff's requests.

28

- Defendant Cooper and Defendant Doyle have refused to produce documents, including their communications with each other and third parties, in response to FOIL requests.

- Defendant Doyle and the AGC have refused to produce records from Defendant Schorr's 2018 disciplinary matter despite the fact that those records are now by public via statute.

59.     Plaintiff incorporates by reference the allegations contained in the Proposed Second Amended Complaint filed in *Zappin v. Cooper et al*., Case No. 20-cv-2669 (S.D.N.Y) (Dkt. No. 105).  In the criminal proceeding brought by Defendant Cooper again Plaintiff, the Manhattan District Attorney's office refused to Defendant Cooper and Defendant Doyle's communications with Investigator Leibhauser and the Manhattan DA's Office despite being material and relevant to the proceeding and consequently discoverable.

60.     The Manhattan DA's Office has refused to produce communications with Defendant Cooper and Defendant Doyle in connection with the 2017 criminal proceeding in response to FOIL Requests.  The Manhattan DA Office has asserted baseless objections.

61.     To date, Plaintiff has not received a single document of discovery or disclosure related to Defendants' roles in *Zappin v. Comfort*, the subsequent disciplinary actions or the 2017 criminal action.  This is despite the fact that Plaintiff is entitled to such discovery and disclosure by law.

62.     Plaintiff has filed various lawsuits against Defendant Cooper, Defendant Doyle and others in connection with the *Zappin v. Comfort* proceeding and subsequent disciplinary actions. In those actions, Plaintiff requested discovery.   In each case, Defendants have opposed discovery/disclosure and refused to produce documents.   In those proceedings, this Court has

abandoned its typical scheduling and discovery practices to block Plaintiff from receiving discovering that would support his claims.

63.     Plaintiff has filed actions in this Court with the primary goal and intention of obtaining discovery and disclosure to support his claims.  Defendants are aware of this.

64.     In *Zappin v. Cooper, et al.* (Ramos), Plaintiff has sought discovery.  In response, Defendant Cooper has against for a blanket injunction barring Plaintiff from filing anymore lawsuits in the Southern District New York again him, Defendant Doyle, various state court judges and various individuals connected to the AGC.  In making the request, Defendant Cooper told the Court in mid-2021 that the purpose of seeking the injunction was because the suits filed by Plaintiff were "distracting from his duties on the bench."  However, this was a blatant lie.  Defendant Cooper retired (prematurely) just months later and is no longer on the bench.

65.     The actual and collateral purpose in seeking the filing injunction is insidious. Defendant Cooper is retired and now knows that he will no longer be afforded free representation by the state in any future lawsuit.  More importantly, Defendant Cooper knows communications and other documents exist evidencing his unlawful and fraudulent scheme with Defendant Doyle (and by extension Defendant Schorr) to attack Plaintiff's law license.  Defendant Cooper knows that Plaintiff had filed actions in this Court with the primary intention of obtaining discovery and disclosure related to his scheme with Defendant Doyle (and by extension Defendant Schorr). Defendant Cooper knows that after leaving the bench he will no longer be able to control the production of his emails and other documents.  Thus, Defendant Cooper is seeking a blatantly abusive and unconstitutional filing injunction such that Plaintiff will be unable to avail himself to the Court seeking discovery and documents to support his claims as information about Defendant Cooper and Defendant Doyle's scheme continues to unfold.  Likewise, Plaintiff will be unable to

avail himself to the Court with claims when Defendants' communications and documents evidencing their scheme eventually come to light.

V.      Predicate Crimes

66.      Defendant Cooper committed wire fraud in violation of 18 U.S.C. § 1343 when he admittedly e-mailed or caused to be emailed the September 18, 2015 Sanction Decision in *Zappin v. Comfort* to various media outlets and the state reporter.  Defendant Cooper knew that the Sanction Decision contained knowingly false statements and representations about Plaintiff's conduct.  The statements were intended to deceive and defraud the public, Plaintiff's employer and business partners, the First Department and the members of the Attorney Grievance Committee.

67.      Defendant Cooper committed wire fraud in violation of 18 U.S.C. § 1343 when he e-mailed or caused to be emailed the February 29, 2016 Child Custody Decision in *Zappin v. Comfort* to Defendant Doyle and the AGC.  Defendant Cooper knew that the Child Custody Decision contained knowingly false statements and representations about Plaintiff's conduct.  The statements were intended to deceive and defraud the public, the First Department, the members of the Attorney Grievance Committee and other attorney disciplinary authorities.

68.      Defendant Doyle committed mail fraud in violation of 18 U.S.C. § 1341 when he admittedly e-mailed or caused to be mailed via the United States Parcel Service a April 22, 2016 Collateral Estoppel Petition containing the February 29, 2016 Child Custody Decision in *Zappin v. Comfort* to the First Department.  Defendant Doyle knew that the Child Custody Decision contained knowingly false statements and representations about Plaintiff's conduct.  The statements were intended to deceive and defraud the public, the First Department, the members of the Attorney Grievance Committee and other attorney disciplinary authorities.

69.     Plaintiff believes that discovery in this action will reveal numerous other acts of mail and wire fraud committed by Defendants that serve as predicate crimes for Plaintiff's RICO claims.

**COUNT I:**
**FEDERAL CIVIL RICO – 18 U.S.C. § 1962(c)**
**(All Defendants)**

70.     Plaintiff re-alleges and incorporates by reference paragraph 1 – 69 of this Complaint as though fully set forth herein.

71.     Defendants violated RICO and Plaintiff was injured as a result.

72.     Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

73.     Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs.

74.     Defendants engaged in an enterprise (together and with other individuals, namely Harriet Newman Cohen and Robert Wallack) as an association-in-fact with a common and continuing purpose described herein using both the Manhattan Supreme Court and the Attorney Grievance Committee to achieve their goals within the meaning of 18 U.S.C. § 1961(4) in the conduct of their affairs through a continuing pattern of racketeering activity as described above. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  There may also be other members of the enterprise who are unknown at this time.

75.     Each enterprise has engaged in, and their activities have affected, interstate commerce.

76.     Defendants engaged in a pattern of racketeering activity.  Defendants, each of whom are persons associated with the enterprise described above did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961.  Defendants had the specific intent to engage in the substantive RICO violations alleged here.

77.     As set forth above, Defendants engaged in predicate criminal acts, namely mail and wire fraud.  These predicate acts were undertaken in furtherance of the racketeering scheme.

78.     The acts of racketeering were not isolated, but rather the acts of the Defendants were related in that they had the same or similar purpose and results, participants, victims and method of commission.  Furthers, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately April 2015 to present day.

79.     In furtherance of the scheme, Defendant Cooper engaged in acts outside the scope of his judicial authority.  Likewise, in furtherance of the scheme, Defendant Doyle engaged in acts outside the scope of his authority as a prosecutor.

80.     As discussed above, Defendants have and continue to purposely conceal documents, communication and information evidencing the scheme in an effort to prevent Plaintiff from bringing claims against them.

81.     The unlawful actions of Defendants have directly, illegally and proximately caused and continues to cause injuries to Plaintiff in his business.  Plaintiff seeks an award of damages to be determined at trial.

## COUNT II:
## FEDERAL CIVIL RICO – 18 U.S.C. § 1962(c)
### (All Defendants)

82.     Plaintiff re-alleges and incorporates by reference paragraph 1 – 81 of this Complaint as though fully set forth herein.

83.     In violation of 18 U.S.C. § 1962(d), Defendants knowingly, willfully and unlawfully conspired to facilitate a fraudulent and deceptive scheme through a pattern of racketeering activity as described above.

84.     The conspiracy commenced at least as early as April 2015 and is ongoing.

85.     The conspiracy's purpose was to attack Plaintiff's business, law license and public reputation.  In other words, the conspiracy's purpose was to inflict professional harm on Plaintiff.

86.     Each Defendant committed at least one overt act in furtherance of such conspiracy as described above.

87.     Defendants entered into an agreement, whether express or implied-in-fact, to undertake the scheme and racketeering activity described above.

88.     In furtherance of the scheme, Defendant Cooper engaged in acts outside the scope of his judicial authority.  Likewise, in furtherance of the scheme, Defendant Doyle engaged in acts outside the scope of his authority as a prosecutor.

89.     As discussed above, Defendants have and continue to purposely conceal documents, communication and information evidencing the scheme in an effort to prevent Plaintiff from bringing claims against them.

90.     The unlawful actions of Defendants have directly, illegally and proximately caused and continues to cause injuries to Plaintiff in his business.  Plaintiff seeks an award of damages to be determined at trial.

## COUNT III:
## STATE LAW FRAUD
**(Defendant Schorr)**

91.     Plaintiff re-alleges and incorporates by reference paragraph 1 – 90 of this Complaint as though fully set forth herein.

92.     As set forth above, Defendant Schorr made numerous material representations to Plaintiff before and during the course of his "representation" of Plaintiff in the *Zappin v. Comfort* child custody proceedings.  In connection for these statements and representations, Plaintiff paid Defendant Schorr some $20,000 indirectly in connection with his "representation" of Plaintiff in *Zappin v. Comfort*.

93.     Defendant Schorr knew his statements and representations were not true when he made them to Plaintiff.

94.     Defendant Schorr engaged in direct acts designed to subvert Plaintiff's position and defenses in *Zappin v. Comfort* as described above.  In did so in apparently collusion with opposing counsel and Defendant Doyle.  Consequently, Defendants actions were not merely negligent, but were deliberate acts to inflict harm on Plaintiff and defraud him.

95.     Plaintiff reasonably relied on Defendant Schorr's representations and, to his detriment, hired and continued to retain Defendant as his "counsel" in *Zappin v. Comfort* based on these representations.

96.     As discussed above, Defendant Schorr purposely concealed his misrepresentations and evidence showing that he had defrauded Plaintiff in an effort to prevent Plaintiff from bringing claims against him.

97.     The unlawful actions of Defendant Schorr has directly, illegally and proximately caused and continues to cause injuries to Plaintiff.  Plaintiff seeks an award of damages to be determined at trial.

### COUNT IV:
### TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS
#### (Defendants Schorr and Doyle)

98.     Plaintiff re-alleges and incorporates by reference paragraph 1 – 97 of this Complaint as though fully set forth herein.

99.     As described above, Defendants Schorr and Doyle knowingly and willfully engaged in acts designed to subvert Plaintiff's position, claims and defenses in *Zappin v. Comfort*, which materially affected his parental rights to his son R.C.Z.

100.    As described above, Defendant Schorr undertook to "represent" Plaintiff in *Zappin v. Comfort*'s child custody proceedings.  During those proceedings, he engaged in acts, alone and in collusion with opposing counsel and Defendant Doyle, designed to undermine and subvert Plaintiff's position, claims and defenses.  Defendant Schorr did so for personal gain.  In doing so, Defendant Schorr tortiously interfered with Plaintiff's parental rights to his son R.C.Z.

101.    As described above, Defendant Doyle undertook actions to inject himself in *Zappin v. Comfort* for the purpose of manipulating distorting the proceeding to be a basis for bringing bad faith and unfounded disciplinary investigations and proceedings against Plaintiff.   Indeed, Defendant worked with Defendant Cooper to write decisions (namely the September 2015 Sanction Decision and February 2016 Child Custody Decision) that fabricated findings and misrepresented Plaintiff's actions to be used as a basis for seeking attorney discipline against Plaintiff.  Likewise, Defendant Doyle worked with Defendant Schorr to advise and direct Schorr to undermine Plaintiff's position, claims and defenses in *Zappin v. Comfort* in return for Defendant

Schorr receiving a more favorable disciplinary outcome in his own attorney discipline proceeding. In taking these actions, Defendant Doyle tortiously interfered with Plaintiff's parental rights to his son R.C.Z.

102.   Defendant Doyle engaged in acts outside the scope of his authority as a prosecutor in interfering with Plaintiff's parental rights.

103.   As discussed above, Defendants have and continue to purposely conceal documents, communication and information evidencing the scheme in an effort to prevent Plaintiff from bringing claims against them.

104.   The unlawful actions of Defendants have directly, illegally and proximately caused and continues to cause injuries to Plaintiff in his business.  Plaintiff seeks an award of damages to be determined at trial.

**COUNT IV:**
**ABUSE OF PROCESS (STATE LAW)**
**(Defendants Cooper)**

105.   Plaintiff re-alleges incorporates by reference paragraph 1 through 104 as if fully set forth herein.

106.   By and through his conduct, Defendant Cooper is liable to Plaintiff under New York State law for abuse of process through the *Zappin v. Cooper, et al.*, Case No. 20-cv-2669.

107.   Defendant Cooper employed regularly issued civil process to seek an unconstitutional and abusive filing injunction in United States District Court for the Southern District of New York as described above.

108.   Defendant employed such process with the intent to cause Plaintiff harm and to conceal his own misconduct and criminal acts.

109.    Defendant Cooper employed such process for an improper collateral purpose as set forth in Paragraph 65.

110.    In employing such process, Defendant Cooper and his counsel (Michael Berg) made knowing and intentional misrepresentations to Judge Edgardo Ramos.

111.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer, damages.   Plaintiff seeks damages in an amount to be determined at trial.

**COUNT VI:**
**42 U.S.C. § 1983 – ABUSE OF PROCESS**
**(Defendants Cooper)**

112.    Plaintiff re-alleges incorporates by reference paragraph 1 through 111 as if fully set forth herein.

113.    By and through his conduct, as described above, and acting under color of state law, Defendant Matthew F. Cooper is liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from court abusive and perverted use of lawful process under the Fifth and Fourteenth Amendments of the United States Constitution.

114.    By and through his conduct, Defendant Cooper is liable to Plaintiff under New York State law for abuse of process through the *Zappin v. Cooper, et al.*, Case No. 20-cv-2669.

115.    Defendant Cooper employed regularly issued civil process to seek an unconstitutional and abusive filing injunction in United States District Court for the Southern District of New York as described above.

116.    Defendant Cooper employed such process for an improper collateral purpose as set forth in Paragraph 65.

117.    In employing such process, Defendant Cooper and his counsel (Michael Berg) made knowing and intentional misrepresentations to Judge Edgardo Ramos.

118.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer, damages.   Plaintiff seeks damages in an amount to be determined at trial.

## **JURY TRIAL DEMANDED**

Plaintiff demands a jury on all issues which may be properly tried by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court:

(a)    Enter judgment in favor of Plaintiff against Defendants;

(b)    Enter judgment award Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendants' activities complained of herein and for any injury ;complained of herein, inclusive of interests and costs, in an amounted to be determined at trial;

(c)    Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)    Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)    Order such other relief that the Court deems just and appropriate.

Dated: March 11, 2022

_____
ANTHONY ZAPPIN
28 Big Oak Place
Pawley's Island, SC 29585
(304) 730-4463 (tel.)
*anthony.zappin@gmail.com*
*Plaintiff*